IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT NASHVILLE

NOVEMBER 1997 SESSION

FILED

February 23, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 01C01-9611-CC-00471 |
| | ) | |
| | ) | Bedford County |
| v. | ) | |
| | ) | Honorable Charles Lee, Judge |
| | ) | |
| ANTHONY JASON MERLO, | ) | (Aggravated burglary, theft of property valued |
| Appellant. | ) | over five hundred dollars but less than |
| | ) | one thousand dollars, and theft of property |
| | ) | valued less than five hundred dollars) |

For the Appellant:                          For the Appellee:

Andrew Jackson Dearing, III              John Knox Walkup
117 South Main Street                    Attorney General of Tennessee
Shelbyville, TN 37160                            and
                                         Ellen H. Pollack
                                         Assistant Attorney General of Tennessee
                                         450 James Robertson Parkway
                                         Nashville, TN 37243-0493

                                         William Michael McCown
                                         District Attorney General
                                         215 College Street, P.O. Box 904
                                         Fayetteville, TN 37334
                                                 and
                                         Robert Crigler
                                         Assistant District Attorney General
                                         One Public Square
                                         Shelbyville, TN 37160

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendant, Anthony Jason Merlo, appeals as of right from his convictions by a jury in the Bedford County Circuit Court for two counts of aggravated burglary, a Class C felony, theft of property valued over five hundred dollars but less than one thousand dollars, a Class E felony, and theft of property valued five hundred dollars or less, a Class A misdemeanor. The defendant was sentenced as a Range I, standard offender to five years and four months in the custody of the Department of Correction and fined ten thousand dollars for each aggravated burglary conviction. For the felony theft of property conviction, the trial court imposed a Range I sentence of three years and six months in the custody of the Department of Correction and a three-thousand-dollar fine. The trial court also sentenced the defendant to eleven months and twenty-nine days and imposed a fine of two thousand five hundred dollars for the misdemeanor theft conviction. The court ordered the defendant to serve his aggravated burglary convictions consecutive to each other for an effective sentence of ten years and eight months. The defendant contends that (1) the evidence is insufficient to support his convictions and (2) the trial court erred by ordering consecutive sentences. We disagree and affirm the trial court's judgments of conviction.

This case relates to the burglaries of two homes on separate days. On June 27, 1995, the residence of William Leath was broken into and a .22 rifle and a twelve-gauge shotgun were taken from his home. Later, on July 5, 1995, a television, a VCR, and a rifle were taken from the home of McKinley Floyd. The defendant and Parker Lee Merlo, the defendant's brother, were jointly indicted for the offenses.

William Leath testified that on June 27, 1995, he and his wife left their home on two occasions. He said that they first left at about 10:30 a.m. and returned at

2

11:30 a.m. and left again at approximately 4:00 p.m and returned approximately one hour later. Mr. Leath stated that when he returned to the house at 5:00 p.m., he discovered that a .22 semi-automatic Winchester and a twelve-gauge shotgun were missing from his bedroom. Mr. Leath testified that he did not see any signs of a forced entry, although he conceded that he did not lock the doors when he left. He stated that he did not give anyone permission to be inside his house or to take the guns. Mr. Leath said that on July 6 he identified two guns recovered by the police as the ones missing from his home. He stated that he had traded an old gun for the shotgun and had owned the shotgun for approximately ten to fifteen years, although he did not know how much the gun was worth. Mr. Leath testified that he also could not place a monetary value on the Winchester rifle, but he said that he had owned the rifle since 1947.

On cross-examination, Mr. Leath testified that he did not know the defendant and that he did not see the defendant take anything from his house. He admitted that he initially told the officers that a Remington rifle, not a Winchester rifle, was stolen, but he testified that he had been mistaken. He identified a couple of holes on the receiver of the .22 semi-automatic Winchester as those he had made for a scope. Mr. Leath said that his shotgun was unusual in that it had a stock-fed magazine.

McKinley Floyd testified that he left his home to go to work at 6:00 a.m. on July 5, 1995. He said that when he returned at approximately 3:50 p.m., he noticed that drawers had been emptied into the floor and the mattresses had been thrown off the beds. He also testified that other items, including a clock and a box of baseball cards, had been moved from where he normally kept them. Mr. Floyd stated that a television, a VCR, and a .22 rifle were missing. Mr. Floyd testified that the next morning, he went to the jail and identified the property taken from his home. He said that he did not give the defendant or anyone else permission to enter his home or to take his property. Mr. Floyd described the television as a 28-inch Sharp that he had purchased about two

3

years earlier. In Mr. Floyd's opinion, the television was worth approximately five hundred dollars. He estimated that the value of the VCR was about two hundred fifty dollars and that the value of the rifle was between one hundred and one hundred fifty dollars. Mr. Floyd stated that there was no damage to his house and that entry had apparently been made through a window located near the back door. On cross-examination, Mr. Floyd testified that he did not know the defendant and that he did not see the defendant break into his house and take his property.

Richard Vincent, Jr., McKinley Floyd's neighbor, testified that on July 5, 1995, he received a call at work from his brother shortly before 12:00 p.m. and that in response to the call, he drove home, picking up his girlfriend in Wartrace on the way. He stated that as he turned onto the road to his house, he saw a tan Ford Tempo similar to one described by his brother coming towards him in the direction of Wartrace, driving approximately thirty miles per hour. He said that he saw only one man inside the vehicle, and the man was shirtless and wearing a red bandana around his head. Mr. Vincent said that he saw the license tag number of the car as it passed, and he stopped and wrote down the number. He testified that he then saw two men walking down the road across from Mr. Floyd's house approximately one hundred and fifty yards from the house. He stated that both men were slender and one was approximately six feet tall and had long hair. Mr. Vincent testified that he then drove home and called the police. He said that on his way back to work about thirty-five to forty minutes later, he passed the same Ford Tempo driven by the same person in Wartrace. Mr. Vincent stated that when he got off work at 5:00 p.m., he went to Mr. Floyd's house where he spoke to the police and gave them a description of the car he saw and the car's license tag number.

On cross-examination, Mr. Vincent testified that he could not identify either the driver or the other two men because they were too far away. He conceded

4

that he did not see anything in the hands of the men he saw walking along the road. He also admitted that he told the officers that the Ford Tempo was brown but explained that he meant light brown. He stated that he could no longer remember the license tag number, but he acknowledged that the police report showed that he said that the number was "997-QDW." He explained on redirect examination that even though the number on the report was one digit off, the car with the license tag number 977-QDW appeared to be the same car he saw.

Tina Merlo, the defendant's girlfriend at the time of the offenses and present wife, testified that she and the defendant were living together when the offenses occurred. She stated that at the end of June 1995, Parker Lee Merlo, the defendant's brother, came to her house with a gun, and the defendant gave him a BB gun. Ms. Merlo testified that at that time, she owned a tan, 1984 Ford Tempo with the license tag number 977-QW. She stated that on July 5, 1995, she drove her car to work at 6:00 a.m. and returned during her break at 9:30 a.m. Ms. Merlo testified that the defendant drove her back to work, borrowing the car until 3:00 p.m. to go to his mother's house. She said that the defendant's brother, Jerry Thompson, and Wayne Freeman were with the defendant when he picked her up at 3:00 p.m. Ms. Merlo stated that she did not know where the defendant was from 9:30 a.m. until 3:00 p.m. She testified that when they arrived at their home, the defendant along with the three men came inside. She said that the defendant had twenty dollars, and she saw some marijuana. Ms. Merlo stated that the defendant and the men left in a different vehicle after approximately one hour. She testified that at approximately 6:50 p.m., Detectives David Adams and Steve Elliot of the Bedford County Sheriff's Department came to her house, and she gave them the marijuana. She said that the defendant was present when the officers arrived.

5

On cross-examination, Ms. Merlo testified that when she returned home from work at approximately 3:30 or 4:00 p.m. on July 4, 1995, the defendant's brother was there and had some Nintendos with him. She said that she, the defendant and his brother went to David Henley's residence later that evening, where a trade was made for the Nintendos. She said that while inside Henley's residence, she saw a television, a VCR, and five guns similar to the ones taken from the victim's homes. Ms. Merlo also testified that the defendant is employed by the Auction Barn to repair televisions and VCRs, and she said that it was not uncommon for the defendant to bring home four or five items at a time to repair. Ms. Merlo stated that during June or July, Henley came to their house and tried to kick their door in and threatened to kill her and the defendant with a gun. She said that Henley had sold drugs for approximately two years. Ms. Merlo testified that since July 5 while at her house, she had overheard Freeman and Thompson make statements regarding burglaries that took place in Bedford County.

On redirect-examination, Ms. Merlo testified that the defendant was working on four or five televisions and two or three VCRs at home when the offenses occurred. She said that she was wrong on direct examination when she said that the defendant and the three men were present when the defendant picked her up from work at 3:00 pm. on July 5. She stated that only the defendant and her daughter were in the car that day. Ms. Merlo testified that the defendant's brother, Freeman and Thompson did come to her house after they arrived home and stayed for about one hour. She said that the defendant was not present when the officers arrived that evening and searched her home. On recross-examination, Ms. Merlo admitted that she was confused about what happened on July 5.

Kathy Prater, a Bedford County court clerk, testified that she conducted a title search for an automobile with the license tag number 977-QDW. She said that the vehicle was a 1984, four-door Ford Tempo belonging to Ms. Merlo.

6

Officer Robert Filer of the Bedford County Sheriff's Department testified that he responded to a call regarding a suspicious vehicle at approximately 11:40 a.m. on July 5, 1995. He said that on the way to the location, he passed a small brown vehicle. He stated that by the time he turned around, the vehicle was no longer in the area. Officer Filer testified that he then went to McKinley Floyd's residence where he was approached by Richard Vincent, Jr., who described the car he saw in the neighborhood as a small brown car with the license tag number 997-QDW. On cross-examination, Officer Filer testified that he arrested David Henley for kicking in the door of the defendant's home.

Bedford County Sheriff Roger Parker testified that on July 5, 1995, when he learned of the license tag number suspected to have been involved in the offenses, he drove to look for a suspect. He said that at approximately 6:50 p.m., he passed a tan Ford Tempo with the license tag number 977-QDW, one digit different from the tag number information given to him. Sheriff Parker testified that he pulled the car over, and he said that the defendant was driving the car and Ms. Merlo was a passenger. He stated that later that evening, he obtained a search warrant for David Henley's residence. He said that a search of the residence revealed the items stolen from the victim's homes in addition to marijuana individually packaged.

David Henley testified that he had known the defendant and Parker Lee Merlo for approximately two years. He conceded that he sold marijuana. Henley stated that approximately a week or a week and a half before July 5, 1995, either the defendant or his brother called him and told him that they had something they wanted him to see. Henley testified that he went to the defendant's house, and the defendant and his brother showed him the guns in the defendant's shed. He said that he shot the rifle in the backyard to see if it worked. He stated that they then agreed to trade the

guns for marijuana. He said that the defendant and his brother came over to his house later to pick up the marijuana and to bring him the guns. Henley testified that a few days before July 5, the defendant and his brother and wife also traded some Nintendos.

Henley stated that around noon on July 5, 1995, the defendant and his brother and wife came to his house. He said that they asked whether he would like to buy a television, a VCR, and a .22 gauge rifle. Henley testified that they brought the television and the VCR inside when he told them that he wanted to see them, and he along with the defendant and his brother went out to a cream-colored Ford Tempo to look at the gun. Henley stated that in exchange for the items, he gave them some marijuana and fifty dollars. Henley identified the victim's property as those items traded by the defendant and his brother and wife. Henley testified that the defendant and his brother were acting together in the deals.

Henley said that he was not present when the officers searched his home on July 5, 1995. He stated that he learned that his house had been searched on July 6 while he was riding around with the defendant's brother. Henley testified that he became angry at the defendant and his brother because he believed that they got him in trouble because the items he traded for marijuana were stolen. He admitted that he went to the defendant's home armed with a gun, knocked on the door, and tapped open the door with his foot. He said that he left after discovering that the defendant was not home but stated that he was later arrested when he stopped at a store. Henley testified that he was charged with burglary for breaking into the defendant's home, possession of marijuana for resale, possession of a firearm where alcohol is served, and public intoxication. He said that he pled guilty to possession of marijuana for resale and received a two-year sentence. He stated that as part of the plea agreement, the remaining charges were dismissed in exchange for Henley testifying against the defendant.

8

On cross-examination, the defendant testified that he had served seven months of his two-year sentence before being released on probation. He claimed that he would have testified against the defendant despite the state's offer to dismiss the other charges against him. Henley denied trading marijuana for merchandise with anyone except the defendant and his brother. On redirect examination, Henley testified that he gave a statement to the police immediately after his arrest but before the state's plea offer was made, telling them that he traded marijuana for the merchandise in the possession of the defendant and his brother. He also claimed that the one hundred and two grams of marijuana found in his house were for his own personal use.

Detectives David Adams and Steve Elliot of the Bedford County Sheriff's Department testified regarding their investigation of the crimes. They related that attempts to take fingerprints at McKinley Floyd's residence were unsuccessful. They also stated that the defendant's wife gave them permission to search her residence and that she showed them marijuana sitting on an end table. Detectives Adams and Elliot testified that when they went to David Henley's residence on July 5, 1995, no one was home but that they saw through open venetian blinds a television and a VCR matching the description of the property stolen from the victims. They said that a search warrant was obtained and the house was searched. In addition to the television and the VCR, they found two rifles and a shotgun in a bedroom under a blanket, a green leafy material in a pink bag in a gun cabinet, and five Nintendos. They testified that the victims later identified the television, the VCR and the guns as belonging to them. Detective Adams stated that he questioned Henley after his arrest. He said that Henley cooperated and gave a statement, even though he was not promised any leniency at the time of the statement. Detective Adams testified that Henley named only the defendant and his brother in connection with the stolen property.

9

Donna Knight, a forensic chemist with the Tennessee Bureau of Investigation, testified that she examined the green leafy material taken from the homes of the defendant and David Henley and determined that it was marijuana. She stated that the marijuana taken from the defendant's residence weighed 2.2 grams and that the marijuana taken from Henley's residence weighed 102.6 grams.

For the defense, Parker Lee Merlo, the defendant's brother, testified that on June 27, 1995, at about 10:30 or 11:30 a.m., David Henley picked him up at his home driving a silver Volkswagen Rabbit. He said that while he entered William Heath's residence and stole two guns, Henley drove the car around the neighborhood. He stated that after the burglary, they went back to Henley's residence and wrapped the guns in a blanket and placed them inside a gun cabinet. Merlo testified that on July 4, the defendant and the defendant's wife took him to Henley's residence to exchange some Nintendos for three marijuana cigarettes and five dollars. He said that he gave the defendant two of the marijuana cigarettes.

Merlo testified that on July 5, 1995, he borrowed the defendant's wife's car at approximately 9:00 or 9:30 a.m. He stated that he picked up Henley and a person known as Ricky T., and they went to burglarize McKinley Floyd's residence, stealing a television and a VCR. He described Ricky T. as being approximately five feet six inches tall with long, blondish-brown hair, a light brown mustache and a goatee. Merlo said that while Henley and Ricky T. drove around, he went inside the house, looked under the mattresses and through the drawers, and took the television and the VCR. He stated that afterwards they went to Henley's house. Merlo testified that he then left by himself and drove back to Floyd's residence to steal a gun that he saw during the first trip. He said that he returned to Henley's house and traded Henley the gun for marijuana. Merlo testified that he returned the defendant's wife's car at

10

approximately 2:00 p.m. He stated that he left the marijuana he received from Henley at the defendant's house on a table to prevent his girlfriend from getting mad at him.

Merlo testified that on July 6, he and Henley went to the defendant's house, but the defendant was not at home. He said that Henley had one of the .22 rifles and that they shot the gun in a field near the defendant's house. Merlo also detailed the events leading up to Henley kicking in the defendant's door on July 6. He said that Henley was angry at the defendant because Henley had been told that the defendant had turned him in to the police.

Merlo testified that the defendant, Gary Thompson, and Wayne Freeman were not involved in the offenses. He said that he had seen Henley sell drugs on earlier occasions and that he had observed at least five exchanges of stolen merchandise for marijuana. He conceded that he initially had a grudge against Henley, but he claimed that he no longer felt that way about him. He admitted that he had been convicted of attempted aggravated burglary and three counts of burglary and that three of the convictions involved the burglaries of the Leath and Floyd residences. On cross-examination, Merlo admitted that he had also been convicted of two other counts of aggravated burglary in 1990.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his conviction because the state did not prove the offenses beyond a reasonable doubt. He also asserts that judgments of acquittal should have been entered by the trial court. The state responds that the evidence establishes the defendant's guilt beyond a reasonable doubt. We agree.

11

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence, but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). In Tennessee, whether the issue of the sufficiency of the evidence for acquittal purposes is being considered by the trial court upon motion for a judgment of acquittal or by an appellate court upon review, the standard to apply is the same. <u>State v. Adams</u>, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995).

For circumstantial evidence to constitute the sole basis for a conviction, the facts must be "so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone." <u>State v. Crawford</u>, 225 Tenn. 478, 484, 470 S.W.2d 610, 613 (1971). The evidence must be both consistent with the defendant's guilt and inconsistent with the defendant's innocence, exclude all other reasonable theories except that of guilt, and establish the defendant's guilt so as to convince the mind beyond a reasonable doubt that he or she committed the crime. <u>Patterson v. State</u>, 4 Tenn. Crim. App. 657, 661, 475 S.W.2d 201, 203 (1971).

When viewed in the light most favorable to the state, the evidence presented at the defendant's trial supports the jury's verdicts. The proof shows that on June 27, 1995, a .22 semi-automatic Winchester and a twelve-gauge shotgun were taken from William Leath's residence without Mr. Leath's permission. David Henley testified that approximately a week or a week and a half before July 5, 1994, the defendant and his brother contacted him and told him that they wanted him to see

12

something. When Henley went to the defendant's residence, the defendant and his brother showed Henley Mr. Leath's guns that were kept in the defendant's shed, and they traded the guns for marijuana.

The evidence also demonstrates that McKinley Floyd returned home from work at approximately 3:50 p.m. on July 5, 1995, and discovered that a television, a VCR, and a .22 rifle were taken from his home. On that same day, the defendant borrowed his wife's car between the hours of 9:30 a.m and 3:00 p.m. Around noon, Richard Vincent, Jr., saw one man driving the car belonging to the defendant's wife and two men walking near the Floyd residence. Approximately thirty to forty minutes later, Vincent saw the defendant's wife's car approximately three miles away from Mr. Floyd's residence. Henley testified that around noon on July 5, 1995, the defendant and his brother brought Mr. Floyd's television, VCR and gun to trade for marijuana and fifty dollars cash, and marijuana was found at the defendant's residence later that evening.

We note that the possession of recently stolen property permits an inference to be drawn by the jury that the possessor stole the property. Bush v. State, 541 S.W.2d 391, 394 (Tenn. 1976). Under these circumstances, we conclude that a rational trier of fact could find beyond a reasonable doubt that the defendant was guilty of the offenses of aggravated burglary and theft of property. Therefore, we also conclude that the trial court properly decided not to enter a judgment of acquittal.

## II. SENTENCING

The defendant challenges the consecutive nature of his sentences. He argues that consecutive sentences are not warranted because they do not reasonably relate to the severity of the offenses. We disagree.

13

No witnesses testified at the sentencing hearing. The presentence report introduced at the hearing reflects that the then twenty-five-year-old defendant claimed that he was innocent. It also reflects that the defendant has a juvenile record for unruly acts, failure to appear, violation of probation, fighting, assault on a minor, disorderly conduct and grand larceny. For the defendant's grand larceny conviction, he was sentenced to the custody of the Department of Correction. It shows that the defendant obtained his GED and a certificate in masonry while incarcerated. The defendant also reported taking industrial electricity courses.

The presentence report states that the defendant's criminal record as an adult consists of felony convictions for one count of possession of marijuana with the intent to sell, two counts of aggravated burglary, and two counts of theft of property valued more than five hundred but less than one thousand dollars. The defendant also has misdemeanor convictions for contempt of court, assault on an officer, disorderly conduct, reckless driving, driving without a license, and two counts of theft of property valued less than five hundred dollars. The report also shows that the present offenses were committed while the defendant was on probation.

The report also shows that the defendant reported that his mental health was poor. He claimed that he had obtained psychiatric treatment at several mental health centers and that on one occasion, he jumped out of a third floor window of a psychiatric hospital. The report states that the defendant asserted that he drank alcohol very seldom and that he had never been much of a drinker in the past. The defendant claimed that because alcohol made him sick, he limited his intake to one to two beers a month. The report reflects that the defendant admitted using alcohol since he was eleven years old in an earlier presentence report prepared in 1991. The earlier presentence report shows that the defendant stated that his drinking increased by the

14

age of thirteen, resulting in him being sent to drug rehabilitation. It also shows that the defendant drank nine quarts of beer a day in 1990.

The defendant admitted using marijuana since he was fourteen years old, stating that he used marijuana "like people use cigarettes." It states that the defendant smoked one-half ounce of marijuana per week. The defendant denied using cocaine or valium or any other drugs. The report reflects that the 1991 presentence report states that the defendant admitted being addicted to cocaine for approximately one year in 1989 and using morphine and liquid morphine three times a day, every day for about a week and a half in September 1989.

The presentence report reflects that the defendant has been employed for short period of times at various jobs, several resulting in the defendant being fired. It also states that the defendant reported working at one job for two years, though an investigation by the probation officer revealed that the defendant had in fact only worked six days before being fired. Also, the defendant has failed to pay fines imposed for his prior convictions.

At the conclusion of the sentencing hearing, the trial court sentenced the defendant to five years and four months for each aggravated burglary conviction, to three years and six months for his felony theft conviction, and to eleven months and twenty-nine days for his misdemeanor theft conviction. The trial court ordered the defendant to serve the aggravated burglary sentences consecutive to each other. In sentencing the defendant, the trial court applied the following enhancement factors pursuant to T.C.A. § 40-35-114 to each of his convictions:

> (1) the defendant has a previous history of criminal convictions or criminal behavior;
>
> (8) the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; and

15

(13)(C) the felonies were committed while the defendant was on probation.

The trial court placed considerable weight on enhancement factors (1) and (13)(C). In mitigation, the trial court considered that the defendant's conduct neither caused nor threatened serious bodily injury. See T.C.A. § 40-35-113(1).

The trial court stated that it chose not to enhance the defendant's sentences to the extent it normally would because the court determined that consecutive sentences were warranted. It concluded that the defendant should serve his aggravated burglary sentences consecutively because the defendant is an offender whose record of criminal activity is extensive and because he committed the offenses while on probation. See T.C.A. § 40-35-115(b)(2) and (6). The trial court said that the sentences were fashioned in such a manner that they would be sufficient to deter the defendant, and it determined that incarceration was necessary to prevent the defendant's further criminal conduct. The court also denied probation, determining that measures less restrictive than confinement have both frequently and recently been applied unsuccessfully to the defendant. See T.C.A. § 40-35-103(1)(C).

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section notes, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

16

In conducting our de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103 and -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

Under the relevant parts of T.C.A. § 40-35-115(b), the trial court was authorized to impose consecutive sentences once it found that:

> (2) the defendant is an offender whose record of criminal activity is extensive; or

> (6) the defendant is sentenced for an offense committed while on probation.

However, these factors "cannot be read in isolation from other provisions of [the Sentencing Reform Act of 1989.] The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995).

In this case, the defendant's criminal record is substantial. Given the defendant's criminal history, we conclude that the trial court properly concluded that consecutive sentences were warranted. The record also reflects that the offenses were committed while the defendant was on probation. Moreover, the consecutive sentences imposed by the trial court reasonably reflect the severity of the defendant's repeated commission of theft-related offenses and are necessary to protect the public from further criminal conduct. Therefore, we hold that the trial court's imposition of consecutive sentences was proper.

17

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
Joseph M. Tipton, Judge

CONCUR:

_____
John H. Peay, Judge

_____
David H. Welles, Judge